**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MELISSA ANN SWANSON,

>                              CASE NO. 18-13564

> *Plaintiff*,                 DISTRICT JUDGE VICTORIA A. ROBERTS

*v.*                           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

> *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON
CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 16)**

## I. RECOMMENDATION

Plaintiff Melissa Ann Swanson challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits (DIB). The case was referred to me for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 16), and **AFFIRMING** the Commissioner's final decision.

## II. REPORT

### A. Introduction and Procedural History

Plaintiff applied for DIB on March 21, 2016, alleging she had become disabled on August 6, 2014. (ECF No. 9 PageID.172.) After the Commissioner initially denied the claim, Plaintiff requested and received a hearing before an administrative law judge (ALJ).

1

(*Id.*, PageID.61-87, 108, 122-123.) On March 14, 2018, the ALJ issued a decision rejecting Plaintiff's claim. (*Id.*, PageID.43-56.) The Appeals Council declined to review that decision, and Plaintiff subsequently sought judicial review of the agency's action. (*Id.*, PageID.29-31; ECF No. 1.) The parties have exchanged motions for summary judgment, briefing has concluded, and the matter is now ready for resolution. (ECF No. 13, 16.)

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

2

even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your

> residual functional capacity and your age, education, and work
> experience to see if you can make an adjustment to other work.
> If you can make an adjustment to other work, we will find that
> you are not disabled. If you cannot make an adjustment to other
> work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001).

"Through step four, the claimant bears the burden of proving the existence and

severity of limitations caused by [his or] her impairments and the fact that [he or] she is

precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*,

336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis

reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r

of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is

required to show that "other jobs in significant numbers exist in the national economy that

[the claimant] could perform given [his or] her RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§

416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her]

limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2).

**D. ALJ Findings**

At step one of the sequential analysis, the ALJ found that Plaintiff had not engaged

in substantial gainful activity from her alleged-onset date through her date last insured,

June 30, 2017. (ECF No. 9, PageID.45.) At step two, the ALJ concluded that Plaintiff had

the following severe impairments: "Chiari malformation with craniotomy; gastro paresis;

4

migraines; major depression; post-traumatic stress disorder (PTSD); and anxiety disorder."

(*Id.*) At step three, the ALJ decided these impairments did not meet or equal a listed

impairment. (*Id.*, PageID.46-48.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the RFC to

perform

> light work as defined in 20 CFR 404.1567(b) except no ladders, ropes, and
> scaffolds; occasional remaining postural activities; avoid concentrated
> exposure to extreme temperatures, wetness, humidity; vibration, pulmonary
> irritants, and hazards; no uneven terrain; limited to unskilled work, involving
> simple routine and repetitive tasks, and no work with the public.

(*Id.*, PageID.48.) At step four, the ALJ concluded that Plaintiff could not perform any past

relevant work. (*Id.*, PageID.54-55.) At step five, the ALJ found that a significant number

of jobs existed nationally that Plaintiff could perform through her date last insured. (*Id.*,

PageID.55.)

### E. Administrative Record

#### 1. Medical Evidence

I have reviewed the medical records and will discuss them as necessary in the

analysis below.

#### 2. Adult Function Report

Plaintiff completed a function report for her disability benefits application.[1] (ECF

No. 9, PageID.240-247.) She provided a host of reasons why she was unable to work:

---

[1] The form is unsigned and undated, but the answers demonstrate that it was Plaintiff who filled it out and the Commissioner's table of contents shows it was submitted on July 22, 2016. (ECF No. 9, PageID.25, 247.)

constant pain, numbness, and tingling; concentration, memory, communication, and sleep problems; insomnia; medication-induced fatigue; anxiety, depression, and PTSD; mood swings; sensitivity to humidity; dizziness, headaches, and migraines; and difficulty reading. (*Id.*, PageID.240.)

On a typical day, she woke with pain and could hardly move; she took medications if she remembered; contacted her doctors and the insurance companies to arrange appointments and handle bills; ate; shopped at "store/park"; laid in bed; watched television; and "dressed for at least 2 appointments." (*Id.*, PageID.241.) Before her car accident and the onset of her conditions, she "could do everything." (*Id.*) Now, she was constantly tired and suffered flashbacks of her car accident. (*Id.*) It took longer to decide what to wear and longer to dress, and she needed help doing so; she also took longer to bathe and did it less often due to pain, fatigue, and depression; hair care was more difficult because of her poor coordination; she frequently cut herself while shaving due to poor concentration; her appetite had decreased; and she did not clean her room. (*Id.*)

She did not need reminders for personal care or medications, and she could prepare her own meals if they were simple. (*Id.*, PageID.242.) Around the house, she vacuumed, did laundry, and folded clothes, but it took longer than it used to and she did them less often. (*Id.*) She needed no encouragement with these tasks. (*Id.*) Questioned if she did yard or house work, she responded, "I don't do many chores. They all take longer, increases pain makes me very frustrated." (*Id.*, PageID.243 (*sic* throughout).)

When going out, which she could do alone, she walked, drove (when she had to), or rode in a car. (*Id.*) Generally, she left only for appointments, she also shopped about four

6

times a week for clothes, gas, and other necessities. (*Id.*) As for handling money, she had a hard time counting change and made numerous mistakes; she had no money for savings, paying bills, or checking accounts. (*Id.*) These troubles had increased since her illness, specifically her poor coordination made it difficult to place money in her wallet and her mental issues caused her to forget what she spent and miscount at stores. (*Id.*, PageID.244.)

She had no hobbies but did visit and talk with friends, albeit less frequently than before her conditions. (*Id.*) On a regular basis, she went to the doctors', stores, and the homes of friends and family (two to three times a month). (*Id.*) She needed reminders to go places but did not need anyone to accompany her. (*Id.*) She struggled getting along with others because most people grew frustrated and angry "because they don't understand what happened. Overall don't like how I've become." (*Id.*, PageID.245 (*sic* throughout).) She felt isolated. (*Id.*) Nevertheless, she got along well with authority figures. (*Id.*, PageID.246.)

Plaintiff stated that all possible abilities—such as talking, hearing, bending, reaching, following instructions, seeing, and concentrating—were impaired. (*Id.*, PageID.245.) She did not know how long she could walk for. (*Id.*) Her answer to "For how long can you pay attention" trailed off: "I am often . . . ." (*Id.*) Similarly, she left blank the answer to the question, "Do you finish what you start?" (*Id.*) Following instructions was difficult. (*Id.*) She handled stress and change poorly. (*Id.*, PageID.246.) Some of her medications left her tired and hungry, others increased her anxiety, decreased her appetite, and made her moodier. (*Id.*, PageID.247.)

### 3. Administrative Hearing

At the hearing, Plaintiff testified that her troubles began with her car accident in August 2014. (*Id.*, PageID.67.) She worked at a car dealership part-time in 2015 for about six months, spending four hours a day there. (*Id.*, PageID.68.) It did not work out because her "symptoms were progressing," specifically her concentration and coordination issues. (*Id.*)

Regarding her physical problems, in April 2016 she had brain surgery. (*Id.*) Prior to that, she had been experiencing headaches constantly, along with pain in her left arm, back, leg, and neck, and tingling, numbness, blurry vision, and concentration issues. (*Id.*, PageID.68-69.) Her hands were weak and numb, making it difficult to hold objects without dropping them, and she also lacked coordination, resulting in accidents like tripping and running into walls. (*Id.*, PageID.69.) She had a difficult time doing laundry and folding clothes, and she often forgot about loads of laundry sitting in the washer. (*Id.*, PageID.75-76.) Grasping common items in the refrigerator was a struggle. (*Id.*, PageID.75.)

Since the surgery, she noticed some improvements but other issues remained and her headaches had transformed into migraines, occurring about three times a week and requiring her to lie down "in a quiet, cold, dark room . . . [and] try to go to sleep." (*Id.*, PageID.70-71.) Her blurry vision was sporadic, and she also had light sensitivity. (*Id.*, PageID.72.) Her balance and coordination problems also persisted. (*Id.*, PageID.73.) The pain in her legs and feet made it worse. (*Id.*, PageID.73-74.)

Her ability to finish tasks had not improved since the surgery, and she rarely got anything done around the house. (*Id.*, PageID.77-78.) Even personal care "takes a lot out

8

of me," she testified. (*Id.*, PageID.78.) Driving, too, was troublesome because of pain and vision issues. (*Id.*)

She estimated that she could stand for about five minutes before her feet started burning and went numb and her left side would also begin to numb. (*Id.*, PageID.74.) Her feet and legs would swell, requiring her to elevate them. (*Id.*) It happened about every three months, but the swelling would last for weeks. (*Id.*)

Her medications made her tired, and she usually took a three-hour nap during the day or a couple shorter naps. (*Id.*, PageID.76-77.) Sleeping at night was difficult because she had nightmares about her car accident. (*Id.*, PageID.77.)

The ALJ then questioned the vocational expert (VE), asking her to

assume a person the same, education, and work experience as Ms. Swanson. This person would be capable of light work. No ropes, ladders or scaffolds. Only occasional remaining posturals. This person would have to avoid concentrated exposure to extreme temperatures, wetness, humidity, vibration, pulmonary irritants, and hazards. Also, there could be no uneven terrain. It would be unskilled work involving simple, routine, repetitive tasks, and no work with the public.

(*Id.*, PageID.82.) Could that person perform jobs in the national economy, the ALJ asked. (*Id.*) Yes, the VE replied: a garment sorter (170,000 positions); merchandise marker (800,000 positions); and inspector/hand packager (400,000 positions). (*Id.*, PageID.83.) Employers, according to the VE, would accept about 10% off-task time in addition to usual breaks; someone off task 20% of the time would be precluded from employment. (*Id.*, PageID.83-84.) If, in addition to the above limitations, the individual was limited to occasional fine and gross manipulation, all three jobs above would be eliminated. (*Id.*, PageID.84.) Nor would any other jobs fit those limitations. (*Id.*) Further, the VE testified

9

that "employers will tolerate one unscheduled absence in a month, but not on an ongoing basis." (*Id.*, PageID.85.) The VE also stated that a person needed good vision to do the jobs above but could wear tinted lenses. (*Id.*, PageID.85-86.)

### F.  General Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[2] carve the evidence into two categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various

---

[2] Various regulations were amended after the claim was filed. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's. See 20 C.F.R. § 404.1527.

decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment

meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling (SSR) 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016) and 96-7p, 1996 WL 374186 (July 2, 1996).[3] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

---

[3] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR) 16-3p, 2016 WL 1119029, at *5; SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

13

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR) 16-3p, 2016 WL 1119029, at *7; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G.  Analysis

Plaintiff makes two arguments: (1) the ALJ failed to properly analyze the medical opinion of Dr. Daniel Singer, a treating physician; and (2) the ALJ botched the assessment of her mental health impairments. (ECF No. 13, PageID.1392-1400.) I will address these arguments in turn.

### 1.  Dr. Singer's Treating-Physician Opinion

Plaintiff's first contention involves Dr. Singer's opinion, which both sides characterize as a treating-physician opinion. (*Id.*, PageID.1393; ECF No. 16, PageID.1416.) In that opinion, dated December 8, 2017, Dr. Singer wrote that Plaintiff had chronic midline thoracic back pain, cervicalgia, occipital neuralgia, and chiari malformation. (ECF No. 9, PageID.1192-1193, 1196.) Every day, Plaintiff would experience neck pain, mid-back pain, and burning in her legs, and she would have four headaches a week, each lasting four to six hours. (*Id.*, PageID.1192-1193.) According to

14

Dr. Singer, Plaintiff had the following capabilities and restrictions, among others: she could walk only a quarter of a city block; sit or stand for 15 minutes at a time; sit and "[s]tand/walk" each for less than 2 hours in an 8-hour workday; she would need a sit/stand option; she would need to walk for 5 minutes every 20 minutes during the workday; she would need unscheduled breaks every 1 to 2 hours, lasting 5 to 10 minutes; she could rarely look down or up, turn her head left or right, or hold her head still; she would be off task about 25 percent of the day; and she would have more than 4 unscheduled absences a month. (*Id.*, PageID.1194-1196.)

The ALJ gave the opinion little weight, finding it inconsistent with Dr. Singer's own treatment notes and with other objective evidence. (*Id.*, PageID.53-54.) Further, "[t]here is no support that the claimant's largely managed impairments would cause her to be off-task 25% or be absent 4 or more days." (*Id.*, PageID.54.) The ALJ also disagreed with most of Dr. Singer's physical limitations because Plaintiff "consistently had normal gait and station. Her musculoskeletal exams showed little beyond some tenderness and restricted flexion and extension." (*Id.*) Earlier in his decision, the ALJ discussed the objective evidence referred to in his analysis of Dr. Singer. (*Id.*, PageID.50-53.) For example, he noted evidence of paraspinal tenderness and pain with movement, but that otherwise the musculoskeletal, neurological, and psychological findings were all normal. (*Id.*, PageID.50 (*citing id.*, PageID.316); *see also id.*, PageID.52 ("Overall physical exams, including neurological exams [and also spinal and cranial MRIs] were also generally normal" in early 2016, other than some tenderness and restricted range of motion. (*citing id.*, PageID.340-442, 526-531, 542-545)).) He also noted that Plaintiff tested within the ADHD range but

generally the objective evidence and her own assertions of her daily activities showed normal attention and concentration. (*Id.*, PageID.47 (*citing id.*, PageID.240-247, 285, 915-938).)

Plaintiff contends that by citing only broadly to physical and psychological examination results, the ALJ failed to consider relevant evidence that would explain Dr. Singer's conclusions. (ECF No. 13, PageID.1393.) First, under a heading of "Migraines," Plaintiff highlights Dr. Singer's opinion that she would experience multiple headaches each week. (*Id.*, PageID.1394.) "This, in and of itself," she asserts, "would support a finding that plaintiff would be frequently off-task or absent." (*Id.*, PageID.1394-1395.) Migraines, she explains, defy objective evidence, and thus "looking to gait, station, or musculoskeletal examinations would not rule out the presence of migraines." (*Id.*, PageID.1394.) Second, Plaintiff takes issue with the RFC's failure to include accommodations for the neck movement restrictions that Dr. Singer identified. (*Id.*, PageID.1395.) "Certainly, normal gait or station would not preclude those limitations. It is not clear whether ambiguous 'musculoskeletal exams' would cover this issue or not." (*Id.*) Third, Plaintiff attacks the ALJ's conclusion regarding her ability to stand and walk, noting that the ALJ did not consider the effect of her foot edema. (*Id.*, PageID.1396.) Similarly, Dr. Singer mentioned "burning in her lower extremities, sensory loss, and lack of coordination. . . . These impairments would not necessarily be detectable from a musculoskeletal exam, but they would obviously affect plaintiff's ability to walk and stand for prolonged periods." (*Id.*)

While the ALJ's analysis could have been more detailed, I remain unpersuaded by Plaintiff's arguments. Regarding the migraines, the first thing to note is that Dr. Singer did

not characterize them as migraines but as headaches and he failed to describe their severity in the space provided for doing so. (ECF No. 9, PageID.1192-1193.) He instead assessed occipital neurolgia, which can be similar to migraines but is a distinct medical condition.[4] Thus, while Plaintiff might be correct that migraine diagnoses depend on subjective rather than objective evidence, *see Brown v. Comm'r of Soc. Sec.*, 2018 WL 7078577, at \*11-13 (E.D. Mich. Dec. 18, 2018), *rep. & rec. adopted by* 2019 WL 265771 (E.D. Mich. Jan. 18, 2019), she has not addressed whether the same is true for occipital neuralgia, the actual condition Dr. Signer diagnosed.

Further, Dr. Singer indicated that medication made the headaches better—he did not select other options such as lying down or going to a dark or quiet room. (ECF No. 9, PageID.1193.) This differed from Plaintiff's testimony is a few respects: she said the migraines, which had developed after her April 2016 surgery, occurred three days a week and that she needed to lie down when experiencing them. (ECF No. 9, PageID.71; *see also id.*, PageID.49 (the ALJ's discussion of this testimony).) Also, nowhere in the statement did Dr. Singer explicitly link the headaches with any particular limitations. Thus, the form itself is lacking and does not clearly bear out Plaintiff's assertions regarding migraines.

The ALJ was also correct that neither Dr. Singer's records nor the other objective evidence supported Dr. Singer's medical opinion. Plaintiff saw Dr. Singer from April 2014

---

[4] *See* Cleveland Clinic, *When It Feels Like a Migraine—But Isn't*, https://health.clevelandclinic.org/when-it-feels-like-a-migraine-but-isnt/ (last accessed Dec. 18, 2019) ("But that's where the similarities end. Occipital neuralgia and migraines require different treatments because their sources of pain are different. Migraines are related to changes in the brain. Occipital neuralgia is due to compressed or irritated nerves that run from the neck, up the back of the head to the scalp.").

through June 2016, producing 20 pages of records. (ECF No. 9, PageID.918-938.) The reports note Plaintiff's complaints of headaches but never called them migraines nor were migraines otherwise mentioned or any abnormalities shown in imaging tests included in Dr. Singer's materials. (ECF No. 9, PageID.918, 922-924, 926, 927.) In the physical examination sections of most reports, Dr. Singer found tenderness in her left occipital area, but no other findings indicate headaches or migraines or indeed any other physical malady, despite extensive neurological, musculoskeletal, and other testing. (ECF No. 9, PageID.919-920, 925, 928, 933, 937.) The assessment sections of the reports noted "Neck Pain" and occipital neuralgia, which is mentioned in Dr. Singer's opinion statement, but never mentioned migraines. (ECF No. 9, PageID.920, 926, 929, 933, 937-938, 1192.) In December 2014, Plaintiff told Dr. Singer that headaches occurred daily, but in June 2016, after her surgery, she stated that the headaches were better overall, with some lingering sharp pain in her "left occipital region that shoots up to her head." (ECF No. 9, PageID.921.) That is where Dr. Singer's records stop. Around the same time, Plaintiff told Dr. Holly Gilmer that after her surgery "[s]he has had resolution of her severe occipital headaches." (ECF No. 9, PageID.522; *see also id.*, PageID.298, 1225 (noting post-surgery improvements in headaches).)

For her part, Plaintiff's argument does not rely on or cite any record evidence concerning her headaches or migraines. In her statement of facts, she notes various occasions when she reported headaches or migraines. (ECF No. 13, PageID.1380-1382, 1384, 1386, 1388 (*citing id.*, PageID.313, 375, 528, 607, 1145).) These, however, are never analyzed and she never explains how or why they support Dr. Singer's opinion concerning

18

the frequency or severity of her headaches (which, recall, Dr. Singer did not describe in any depth and thought could be treated with medication). Not only has she failed to engage the evidence, she has overlooked countervailing reports in which she denied having headaches. (ECF No. 9, PageID.352, 367, 371, 383, 419, 427, 436.) The failure to deal with contrary evidence cuts against Plaintiff's position. *Cf. Gordon o/b/o SMCG v. Comm'r of Soc. Sec.*, 2019 WL 3423320, at *5 (E.D. Mich. July 29, 2019) ("But the ALJ—and the plaintiff—also 'must take into account whatever in the record fairly detracts from its [*i.e.*, other evidence's] weight.'" (*citing Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992))).

To conclude that the ALJ erred, then, the Court would need to assume that Dr. Singer meant to say migraines, or something just as crippling, that Plaintiff's complaints of headaches indicate potentially disabling pain, and that there were enough complaints (which, as noted, Plaintiff never analyzes)—compared to the evidence the ALJ relied on—to suggest that the ALJ's reasons for discounting the medical opinion were not "good." 20 C.F.R. § 404.1527(c)(2). This string of reasoning requires inferences and evidentiary assessments that Plaintiff has not supported or even addressed.

Indeed, she does not explain what evidence the ALJ actually overlooked or how he misjudged the evidence discussed in his decision. I cannot see that he made any such mistakes. The ALJ acknowledged Plaintiff's testimony regarding her migraines but discounted it because it was inconsistent with medical evidence—Plaintiff fails to challenge this credibility determination. (ECF No. 9, PageID.49.) It is true the ALJ did not expressly mention headaches in his recitation of the evidence, but recall that the specific

diagnosis from Dr. Singer was occipital neuralgia, a neurologic condition that can be tested by tenderness along the occipital nerve.[5] The ALJ did recount the largely normal neurological test results, noting findings of tenderness when they occurred. (*Id.*, PageID.50, 52.) This discussion was accurate: the neurological, nerve, and neck testing mostly returned normal results. (*Id.*, PageID.297, 305, 316, 348, 353, 372, 375-376, 379-380, 383-384, 414, 419, 424, 428, 437, 441-442, 466, 467, 469, 472, 523, 526, 529-530, 554, 1158-1159, 1166-1167, 1209.)[6] Only occasional cervical or occipital tenderness was noted, but even then the neurological testing was normal and often her neck was supple with a full range of motion. (*Id.*, PageID.297, 305, 352, 569, 582-583, 1154, 1163, 1224, 1232-1233, 1355-1356.) Plaintiff has not addressed the tenderness findings and thus offers the Court no justification for doubting the ALJ's analysis of them or for determining they are more probative than the other neurological evidence. Thus, the ALJ's decision sufficiently canvasses the evidence regarding headaches, such that accepting Plaintiff's argument would necessitate reweighing the evidence in her favor, which the Court cannot do. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) ("The scope of our review is limited to an examination of the record only. We do not review the evidence *de novo*, make credibility determinations nor weigh the evidence.").

---

[5] Johns Hopkins Medicine, *Occipital Neuralgia*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/occipital-neuralgia (last accessed Dec. 19, 2019).

[6] Abnormal neurological findings did occur, less frequently, but it is not clear that they are relevant to occipital neuralgia; for example, it is not apparent that abnormal reflexes support Plaintiff's complains of headaches. *See, e.g.*, (ECF No. 9, PageID.1095, 1100, 1106, 1112-1113, 1117, 1122, 1127-1128, 1132-1133, 1137, 1141-1142.)

I also disagree that Dr. Singer's opinion regarding the frequency and duration of the headaches is enough "in and of itself" to support his opinion regarding absences and off-task time. (ECF No. 13, PageID.1394-1395.) For one thing, Dr. Singer never made this connection; he did not assert that the off-task time and absences resulted from headaches. Plaintiff appears to assume that by opining that four weekly headaches would last four to six hours each, Dr. Singer was saying that Plaintiff could not work during those periods. Nothing suggests he intended to convey this message, however, especially because he thought medication made her "better." (ECF No. 9, PageID.1193.)

Plaintiff does not address any other evidence of her concentration and attention abilities. The ALJ did, however, adequately assessing the evidence. Some of it favors Plaintiff, particularly neuropsychological testing showing her to fall within the ADHD range. (*Id.*, PageID.285.) The ALJ acknowledged this evidence but also pointed out that other tests run during the same evaluation showed her "complex attention tasks were generally intact" and that the lowest scores she received in attention testing—rating moderate to severe impairments on simple attention—were "improbable and requires replication," according to the evaluator, Dr. Darren Fuerst. (*Id.*, PageID.285; *see also id.*, PageID.47 (discussing the testing).) As the ALJ also pointed out, the rest of the objective evidence on her concentration and attention was almost always normal. (*Id.*, PageID.47.) The ALJ cited Dr. Singer's own examination notes as recording normal or intact abilities in these areas. (*Id.*, PageID.919, 925, 929, 933, 937.)[7] One report noted her attention and

---

[7] In some of these records, the ending section entitled "Instructions" stated that Plaintiff "presents with . . . difficulty with sleeping and concentration." (ECF No. 9, PageID.926, 929.) Yet this contradicts the

concentration as "variable," but did not elaborate on any possible abnormalities. (*Id.*, PageID.595.)[8] On a few occasions, she denied an inability to concentrate. (ECF No. 9, PageID.300-301, 943, 952, 957.) Without any argument regarding, or even mention of, this evidence and how it affects the ALJ's analysis of Dr. Singer's opinion, I cannot credit Plaintiff's argument on this point.

Moreover the ALJ was not wrong to claim that no evidence supports Dr. Singers' prediction on absenteeism, at least not expressly. And Plaintiff fails to present any evidence permitting reasonable inferences bolstering Dr. Singer's prediction. In any event, many courts in this Circuit hold that a medical source's estimates on absenteeism and the need for unplanned work breaks are not medical opinions entitled to deference, even when made by treating physicians. *See Threlkel v. Berryhill*, 2019 WL 446245, at *3 (W.D. Ky. Jan. 31, 2019) ("Courts within this circuit have held that physician estimates of a patient's rate of absenteeism and need for unscheduled breaks away from the job site, which, if accepted, would require an ultimate finding of disability, are not genuine medical opinions."), *rep. & rec. adopted by* 2019 WL 2764405 (W.D. Ky. July 2, 2019); *Rush v. Comm'r of Soc. Sec.*, 2018 WL 6175374, at *3 (E.D. Mich. Oct. 5, 2018) ("Dr. Samuel's opinions that Rush could not work, and would frequently be absent from work and off task, are not medical

---

[8] objective findings written in the "Physical Examination" section, and instead appears to come from Plaintiff's subjective complaints. (*Id.*, PageID.924, 927.) Plaintiff has not challenged the ALJ's findings regarding her credibility or addressed this evidence, and therefore the Court has no basis for finding the apparently subjective-based notes more probative than the objective findings.

[8] Three therapy records from Tanya Tietema, a counselor, reported that Plaintiff lost her train of thought during the session, but Tietema made no formal assessments of Plaintiff's capacity for concentration or attention. (ECF No. 9, PageID.1252, 1264, 1275.)

opinions to which the ALJ was required to defer."), *rep. & rec. adopted by* 2018 WL 6171596 (E.D. Mich. Nov. 26, 2018); *Chhay v. Colvin*, 2014 WL 4662024, at *6 (N.D. Ohio Sept. 17, 2014) (noting the caselaw). Under this rule, the ALJ did not err—but as explained above, even if deference was required absent a "good reason," Plaintiff has failed to justify the conclusion that the ALJ's reasons were not "good."

Next, as noted, Plaintiff contends that the ALJ failed to factor into the RFC Dr. Singer's conclusion that Plaintiff could rarely move her neck, asserting that the ALJ's citations to normal musculoskeletal exams did not clearly "cover this issue." (ECF No. 13, PageID.1395.) Plaintiff has failed to look at the musculoskeletal examinations that the ALJ actually cited, which come from Dr. Singer, among others, and indeed cover neck movements. (ECF No. 9, PageID.54 (*citing id.*, PageID.918-938).) All of Dr. Singer's examinations recorded Plaintiff's neck as having full strength and full range of motion; the only abnormalities were tenderness or tension. (*Id.*, PageID.920, 925-926, 928-929, 933, 937.) Other records likewise reported that Plaintiff's neck or cervical spine was supple with full range of motion or generally normal. (*Id.*, PageID.297, 348, 353, 367, 375-376, 379-380, 383-384, 419, 424, 428, 1158-1159, 1166-1167, 1209.) Plaintiff does not address any of this evidence or cite other records that would suggest the ALJ's treatment of Dr. Singer's opinion was in error. Consequently, I would reject Plaintiff's argument.

Plaintiff's final contention regarding Dr. Singer is that, as it pertains to standing and walking capabilities, the ALJ ignored the significance of her occasional foot edema and that impairments in sensory loss, burning extremities, and lack of coordination "would not necessarily be detectable from a musculoskeletal examination," which is what the ALJ

23

relied on. (ECF No. 13, PageID.1396.) Again, however, Plaintiff's brief argument fails to analyze or even cite any relevant evidence and offers a supposition about the contents of examinations that is contradicted by the facts.

Plaintiff does not describe her foot edema or how it affects her standing and walking. In fact, she offers only a citation to the ALJ's decision that discussed the edema as a reason for finding Plaintiff *more* restricted than the state agency consultant concluded. (ECF No. 9, PageID.54.) As such, Plaintiff's argument essentially asks the Court to find that this reference to edema should have been given more weight. But the Court cannot reweigh the evidence in this manner, and in any event I see nothing wrong with the ALJ's analysis, which addressed this lone piece of evidence in the context of other materials.

Regarding that other evidence, Plaintiff overlooks the fact that many of the musculoskeletal examinations did measure her sensation and coordination, along with gait, posture, movement in her extremities, and strength. The findings were overwhelmingly normal, with only occasional tenderness or limited range of motion. (*Id.*, PageID.283, 297, 305, 348, 352, 357, 363, 371-372, 375-376, 379-380, 383-384, 387, 414-415, 419, 424, 428, 432-433, 437, 441-442, 466, 479, 480, 523, 526, 528-530, 554, 569, 582-583, 1013, 1017, 1145-1146, 1150, 1158-1159, 1166-1167, 1209, 1224, 1232-1233, 1355-1356.) A few examinations showed edema, abnormal reflexes, and impaired "finger to nose." (*Id.*, PageID.1095, 1100, 1106, 1112-1113, 1117, 1122, 1127-1128, 1132-1133, 1137, 1141-1142.) Plaintiff does not address this evidence or attempt to show why it is relevant to this issue and more probative than the evidence of normal results. Nor does she explain how burning sensations would limit her standing and walking enough to conclude that the ALJ

24

failed to provide good reasons for rejecting Dr. Singer's opinion. Consequently, I am unpersuaded by Plaintiff's argument.

### 2.     Mental Impairments

In Plaintiff's second argument, she contends that the ALJ erred by finding that her mental impairments could be "accommodated by a limitation to 'unskilled work, involving simple routine and repetitive tasks, and no work with the public.'" (ECF No. 13, PageID.1397 (*citing id.*, PageID.48).) To understand the argument, which I detail more below, a review of the ALJ's decision is necessary.

The ALJ's step-three analysis found that, with regard to concentrating, persisting or maintaining pace, Plaintiff had moderate limitation. (ECF No. 9, PageID.47.) Among other things, the ALJ observed that objective testing showing "moderate to severe" limitations needed replication because as Dr. Fuerst, the evaluator, noted, the results were improbable. (*Id.* (discussing *id.*, PageID.285).) The other objective testing administered by Dr. Fuerst was mixed, as the ALJ recognized: Plaintiff's complex attention tasks were generally intact but she also fell within the ADHD range. (*Id.* (discussing *id.*, PageID.285).) The ALJ also observed the normal attention and concentration findings Dr. Singer reported. (*Id.* (discussing *id.*, PageID.919, 925, 929, 933, 937).)

The ALJ gave little weight to counselor Tanya Tietema's assessment, made on several occasions, that Plaintiff was regressing. (*Id.*, PageID.54; *see also id.*, PageID. 620, 644, 652, 669, 675, 677, 681, 683, 690, 693, 696, 700, 776, 829, 833, 890, 1272, 1310, 1314 (Tietema's reports that Plaintiff was regressing).) The ALJ acknowledged Plaintiff had treated with Tietema, but noted that the counselor was not an acceptable medical source

25

and, among other things, Plaintiff's mental status examinations with Tietema remained unchanged. (*Id.*, PageID.54.) Elsewhere, the ALJ wrote that although Plaintiff complained of increasing depression, "there is no objective corroboration of these complaints as the claimant's mental state generally remained consistent." (*Id.*, PageID.53.)

The ALJ gave great weight to the opinion of state agency consultant Dr. Leonard Balunas. (*Id.*, PageID.54.) Dr. Balunas opined that Plaintiff had moderate limitations in concentration, persistence, or pace, but also wrote that "[t]here are not problems with attention and there is sufficient concertation to perform simple 1-2 step tasks all on a routine and regular basis." (*Id.*, PageID.98, 105.) The ALJ repeated this finding verbatim and wrote that while Plaintiff had moderate limitation in this area, Plaintiff's "other exams noted intact concentration . . . [and] support that conclusion that she retains the ability to complete simple routine and repetitive tasks." (*Id.*, PageID.54.)

Plaintiff's argument begins by noting that the ALJ should not have insisted on objective evidence of the psychological impairments, as when he discredited Tietema's findings, because such impairments defy objective substantiation. (ECF No. 13, PageID.1397-1398.) Next, she says the ALJ mischaracterized the conclusion of the state agency consultant:

> [T]he ALJ suggested that Dr. Balunas found no limitations as to plaintiff's ability to pay attention: 'There are no problems with attention and there is sufficient concentration to perform simple 1-2 step tasks all on a routine and regular basis' [ECF No. 9, PageID.54]. However, the doctor only opined as to attention and concentration as a pair, never individually. [ECF No. 9, PageID.104]. Consequently, a finding that plaintiff had full attention capabilities is not supported by substantial evidence.

(ECF No. 13, PageID.1398-1399.) The final leg of her argument is that, under caselaw from this District, the RFC's limitation to unskilled work with simple routines and repetitive tasks does not sufficiently incorporate the ALJ's own finding that she was moderately limited in concentration, persistence, and pace. (*Id.*, PageID.1399-1400 (*citing Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009)).) "Since the ALJ found that plaintiff had moderate limitations as to concentrating, persisting, or maintaining pace, he was obliged to include consistent limitations in his RFC," and the unskilled/simple work limitation did not satisfy this obligation. (*Id.*, PageID.1400.)

I find these contentions unpersuasive. She is right that the concept of objective evidence has less significance in the realm of psychological impairments likely anxiety and depression, the diagnoses of which instead "appear to rely heavily upon what the claimant says and how he or she appears." *Hollis v. Comm'r of Soc. Sec.*, 2015 WL 357133, at *20 (E.D. Mich. Jan. 27, 2015). Thus, the observations of trained professionals might constitute good evidence concerning these impairments. *See Keeton v. Comm'r of Soc.*, 583 F. App'x 515, 526 (6th Cir. 2014). Here, however, the ALJ relied, (ECF No. 9, PageID.53), on the numerous mental status examinations in the record showing depression or anxiety but appropriate affect, interactive interpersonal presentation, and full orientation and alertness; many came from Tietema. (*Id.*, PageID.604, 606, 609, 612, 615, 618, 621, 624, 627, 630, 633, 636, 639, 642, 647, 650, 655, 658, 661, 664, 667, 670, 673, 676, 679, 682, 685, 691, 694, 697, 702, 705, 707, 710, 713, 716, 719, 722, 725, 733, 736, 739, 742, 745, 748, 751, 754, 757, 762, 765, 768, 771, 774, 777, 780, 783, 786, 789, 792, 795, 798, 801, 814, 817, 820, 823, 827, 830, 835, 838, 841, 844, 847, 850, 853, 856, 859, 862, 865, 868, 873, 876,

879, 882, 885, 888, 891, 894, 897, 900, 903, 906, 909, 912, 1236, 1239, 1242, 1245, 1248, 1251, 1254, 1257, 1260, 1263, 1266, 1269, 1274, 1277, 1280, 1283, 1286, 1289, 1292, 1295, 1298, 1301, 1304, 1307, 1312, 1315, 1318.) Sometimes her mood was neither depressed nor anxious but euthymic. (ECF No. 9, PageID.688, 728, 1326.). Many other psychological examinations also returned normal results, including mood, affect, alertness, and (when measured) memory, orientation, judgment, and thought process. (ECF No. 9, PageID. 302, 313, 316, 348, 367, 371, 375, 380, 383, 414, 419, 423, 441, 428, 432, 1112, 1117, 1122, 1127, 1132, 1137, 1141, 1145, 1150, 1154, 1158, 1162, 1166-1167, 1209, 1224, 1229, 1232, 1341; *but see id.*, PageID.352 (good judgment, normal mood, alertness, orientation, and memory, but poor insight and abnormal affect).) These were direct observations by professionals concerning aspects of Plaintiff's psychological health.

It is true, as noted above, that Tietema at times noted Plaintiff's regression and wrote made other remarks as well, such as Plaintiff's tearful state or struggles filling out paperwork at one session. (*Id.*, PageID.720, 746, 762, 772, 1313.) But the ALJ considered the countervailing evidence and explained his decision, namely that the status examinations repeatedly indicated largely normal results, except for her depressed or anxious mood. Given the large number of such results, the ALJ could reasonably conclude that the assertions of regression were not borne out by the examinations. Therefore, I cannot conclude that the ALJ erroneously relied on the absence of objective evidence to reject Plaintiff's claim when, in truth, he utilized such evidence, which existed in great quantity.[9]

---

[9] In addition, ALJ accurately noted that despite Tietema's warnings of regression, Plaintiff's treatment remained largely unchanged, consisting of therapy and medication. (ECF No. 9, PageID.53.) At some point

Plaintiff has not cited or engaged any of this evidence to show that reliance upon it was error, either legal or factual. In light of her silence, I would decline to reassess the relative weights of the evidence.

Her argument about Dr. Balunas is difficult to comprehend and appears to have resulted from overlooking Dr. Balunas's full report. She takes issue with the ALJ's statement that "[t]here are no problems with attention and there is sufficient concentration to perform simple 1-2 step tasks all on a routine and regular basis." (*Id.*, PageID.54.) For some reason, Plaintiff thinks it is significant that Dr. Balunas supposedly never assessed attention and concentration individually, but only "as a pair." (ECF No. 13, PageID.1398.) Even if this distinction were meaningful, Plaintiff is wrong on the facts: as noted above, the ALJ's sentence that supposedly mischaracterized Dr. Balunas's opinion was lifted verbatim from Dr. Balunas's report. (ECF No. 9, PageID.105.)

Regarding the relationship between moderate limitations and unskilled/simple work restrictions, Plaintiff is correct that courts have found a limitation to unskilled or simple work did not properly accommodate the ALJ's finding of moderate limitations in concentration, persistence, and pace. The reason is that the limitation to simple work focuses on the complexity of the task, not the "frequency of how often the person can concentrate." *Brown*, 672 F. Supp. 2d. at 797.[10] In other words, "[t]here may be cases where

---

in the fall or winter 2015, she went from "1-2" therapy sessions per week, *see, e.g.*, (*Id.*, PageID.753), to "twice per week to address increase in symptoms and level of hopelessness," (*Id.*, PageID.766). The ALJ's observation, however, remains valid, *i.e.*, the treatment was the generally the same throughout the relevant period.

[10] *Brown*, like many of the other cases dealing with this topic, addressed a challenge to the ALJ's hypothetical question to the VE that incorporated an unskilled/simple limitation despite finding elsewhere that the claimant was moderately impaired. *Id.* at 797. The cases remain relevant, however, because the

. . . moderate limitations [in concentration, persistence, or pace] preclude the performance of even some simple, unskilled tasks." *Lewicki v. Comm'r of Soc. Sec.*, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

But "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Zizzo v. Comm'r of Soc. Sec.*, 2013 WL 5291663, at *13 (E.D. Mich. Sept. 19, 2013) (*quoting Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682 at * 7 (E.D. Mich. 2011), *rep & rec. adopted by* 2011 WL 2682892 (E.D. Mich. 2011)). Under this reasoning, many cases have rejected claims of error in these circumstances when "a medical professional determined that the claimant suffered from limitations in CPP [*i.e.*, concentration, persistence, or pace] or was otherwise limited to simple, routine, repetitive tasks." *Ervin v. Comm'r of Soc. Sec.*, 2017 WL 955129, at *3 (E.D. Mich. Mar. 13, 2017) (collecting cases). More specifically, the "cases within this District that do not remand for the ALJ to include a moderate concentration, persistence, or pace limitation were distinguishable [from those that do remand] because a medical professional had made a specific finding that the claimant had moderate difficulties in concentration, persistence, or pace, but could still work on a sustained basis." *Cwik v.*

---

basic conflict is the same whether the unskilled/simple limitation was in the RFC or questions to the VE: both suggest a potential contradiction in the ALJ's findings that could affect RFC and thus the employment available to the claimant. *Cf. Ervin v. Comm'r of Soc. Sec.*, 2017 WL 955129, at *3 (E.D. Mich. Mar. 13, 2017) ("Case law within this District has held that where an ALJ . . . determines that a claimant has moderate impairments in CPP [*i.e.*, concentration, persistence, and pace], the ALJ must include such limitation in the RFC assessment or the hypothetical posed to the VE.").

*Comm'r of Soc. Sec.*, 2012 WL 1033578, at *10 (E.D. Mich. Feb. 23, 2012), *rep. & rec. adopted by* 2012 WL 1033527 (E.D. Mich. Mar. 27, 2012); *see also Hicks v. Comm'r of Soc. Sec.*, 2011 WL 6000714, at *8 (E.D. Mich. Aug. 30, 2011) ("[T]here is a line of CPP cases within this District that do not remand for the ALJ to include a 'moderate' CPP limitation where a medical professional makes a finding that the claimant has 'moderate' difficulties in CPP (e.g., on a Psychiatric Review Technique Form) but ultimately concludes that the claimant can work." (collecting cases)), *rep. & rec. adopted by* 2011 WL 6000701 (E.D. Mich. Nov. 28, 2011).

*Zizzo*, for example, noted that the ALJ's limitation to unskilled, simple, and non-production work was proper because medical sources had issued the same opinion and the plaintiff "simply does not address why the limitation . . . is not adequate in this case." 2013 WL 5291663, at *13. Similarly, in *Lewicki*, a "psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work." 2010 WL 3905375, at *3. Accordingly, the court found that the ALJ adequately accounted for the plaintiff's impaired concentration, persistence, and pace. *Id.*; *see also Carlin v. Comm'r of Soc. Sec.*, 2013 WL 639338, at *7 (E.D. Mich. Jan. 11, 2013) (finding that a limitation to simple/routine work was sufficient despite moderate limitations in CPP because medical sources made the same findings in their opinions), *rep. & rec. adopted by* 2013 WL 639147 (E.D. Mich. Feb. 21, 2013).

Here, the ALJ appropriately relied on the medical opinion of the agency consultant, Dr. Balunas, who found that despite moderate impairment in concentration, persistence, or pace Plaintiff could "carry out one and two step tasks that do not require sustained

31

concentration." (ECF No. 9, PageID.54, 98, 104-105.) As noted above, Dr. Balunas specifically found that "[t]here are no problems with attention and there is sufficient concentration to perform simple 1 - 2 step tasks all on a routine and regular basis." (*Id.*, PageID.105.) Given this medical opinion, the present case falls within the judicial decisions described above that have permitted the ALJ to assess moderate limitations and prescribe unskilled/simple work. In addition, the ALJ expressly addressed this matter, noting evidence of moderate limitation but concluding that Plaintiff retained the ability to complete unskilled/simple tasks. (*Id.*, PageID.51-52, 54.)

Plaintiff has not engaged the relevant caselaw or presented evidence or argument on why her limitations preclude unskilled/simple works. She therefore offers the Court no grounds to reverse. *Cf. Zizzo*, 2013 WL 5291663, at *13 ("Plaintiff simply does not address why the limitation to unskilled, routine, and non-production work is not adequate in this case to address plaintiff's specific moderate limitation in concentration persistence or pace and the undersigned finds no basis to reverse the ALJ on this basis."); *Lewicki*, 2010 WL 3905375, at *3 ("Plaintiff does not . . . explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace."). Accordingly, I recommend rejecting this argument.

### H.  Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (ECF No. 13), **GRANTING** the Commissioner's Motion, (ECF No. 16), and **AFFIRMING** the Commissioner's final

32

decision denying benefits.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  January 6, 2020                    S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 6, 2020                     By s/Kristen Castaneda
                                          Case Manager

34